UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08-20266-CR-ALTONAGA

**UNITED STATES OF AMERICA**,

    Plaintiff,
vs.

**ABIMEL CARABALLO**,

    Defendant.
_____/

**ORDER ON MOTION TO SUPPRESS**

**THIS CAUSE** came before the Court on July 10, 2008, for an evidentiary hearing on Defendant, Abimel Caraballo's ("Caraballo['s]") Motion to Suppress and Incorporated Memorandum of Law ("Motion") [D.E. 27]. Defendant faces charges of conspiracy to smuggle aliens (Count I), encouraging and inducing aliens to come to, enter and reside in the United States (Counts 2-12), and bringing aliens to a place other than a designated port of entry (Counts 13-23). The undersigned has carefully considered the parties' written submissions, applicable law, and the testimony and evidence presented at the hearing.

**I. BACKGROUND**

Defendant's Motion seeks to suppress all evidence resulting from the warrantless stop and search of his vessel on August 8, 2007, by the North Miami Police Department ("NMPD"), including any statements made by Anderson Lopez and Edel Miranda. Defendant argues the stop and search were illegal under the Fourth Amendment because the law enforcement officer "lacked any reasonable suspicion that ay [sic] laws were being broken." (*Motion* at 3).

CASE NO. 08-20266-CR-ALTONAGA

At the hearing, Officer Dagoberto Andollo of the NMPD Marine Patrol Division ("MPD") testified he has been a law enforcement officer for nine years and assigned to the MPD for the past four years. During Officer Andollo's assignment to the MPD, he has conducted at least twenty vessel inspections for fishery violations per weekend.

According to Officer Andollo, on August 8, 2007, one of the first days of the regular lobster season, he was conducting surveillance of boats passing through Baker's Haulover Cut. During lobster season, recreational and commercial fisherpersons may legally take lobster in accordance with regulations governing size, egg-bearing status, and bag limits. Officer Andollo testified that lobster poachers will often display fishing rods on their boat instead of a dive flag and dive gear in order to avoid notice and inspection by law enforcement.

Parked in an unmarked car under the Haulover Inlet Bridge at 11:30 a.m., Officer Andollo observed Defendant's vessel, a 25-foot fishing boat with vessel identification numbers "FL 2102GE," a blue hull, and dual outboard engines, motoring towards Baker's Haulover Cut from offshore. Using binoculars for his surveillance, Officer Andollo observed two individuals aboard the vessel continually looking about and scanning the whole area as they passed through the cut approximately 50 yards from his onshore location. These individuals were later identified as Anderson Lopez and Edel Miranda. Officer Andollo also observed three fishing rods: a heavy trolling rod, a heavy spinning rod, and a light spinning rod.

Officer Andollo testified that the behavior of the two individuals aboard the boat and the way the fishing rods were displayed aroused his suspicions that the men may be involved in illegal fisheries activity. Officer Andollo indicated that boats with trolling rods generally have more than one, that boats returning to shore from fishing usually put up or stow away rods they had not recently used,

CASE NO. 08-20266-CR-ALTONAGA

and that in his experience, one did not use a light spinning rod at the same time as a heavy trolling rod.

Once through the cut, Officer Andollo observed the vessel bear north along the shoreline and marina, and he followed in his vehicle as far as possible. When it was clear to Officer Andollo that the vessel was not turning into the marina or any other intermediate location but was continuing northbound toward the Intracoastal Waterway, Officer Andollo drove away from the shoreline to Collins Avenue and then north to the Haulover boat ramps, anticipating that the vessel may be headed there. He parked his vehicle behind other vehicles and boat trailers in order to observe the ramp. When the vessel that Officer Andollo had observed under the bridge arrived at the ramp, a truck with boat trailer parked next to him was started, pulled out to the ramp area and backed down the ramp to load the observed vessel. As Officer Andollo drove over to the ramp area, he observed the Defendant exit the truck, climb into the boat and climb out again, returning to his truck. He also observed the three men were in a hurry to load the boat on the trailer, and one of them, Mr. Lopez, standing in the water waist deep on the ramp.

Officer Andollo parked his vehicle near the truck and trailer, approached the boat, and identified himself as "Marine Patrol." He testified that he asked Messrs. Lopez and Miranda whether they had caught any fish, and Mr. Lopez replied, "Yes," then said, "No." The officer asked the men again, "Well, what it is, yes or no?" Mr. Lopez replied in the negative and stated fishing was slow. Officer Andollo asked the two men if they had fishing licenses and they said, "No," but Defendant Caraballo indicated he did.

Officer Andollo then asked the men for identification and Mr. Lopez stated he had left his wallet on the boat. However, Officer Andollo noticed the outline of a wallet in his pocket and asked

3

CASE NO. 08-20266-CR-ALTONAGA

Mr. Lopez if his identification was in his wallet. Mr. Lopez retrieved his wallet from his pocket and provided identification to Officer Andollo, his hand shaking from nervousness. Officer Andollo testified that the men's behavior made him nervous. He told the men that he had to radio in their identities, to wait, and he returned to his vehicle at which time he radioed for back-up.

When back-up officers arrived, Officer Andollo directed the three men to move to the side of the truck and informed them he was going to board the vessel to conduct a fisheries examination. He asked whether he would find any fish. Mr. Lopez indicated he would not. On cross-examination, Officer Andollo testified he did not immediately open the cooler that was in front of the console when he boarded the boat, but opened the hatch of the cuddy cabin in order to conduct a protective sweep to assure his personal safety. Upon opening the hatch, he observed a number of people and bags in the cabin in plain view. Officer Andollo directed his back-up officers to detain the three men, called for more back-up officers, and began contacting Immigration and Customs Enforcement ("ICE") and the United States Border Patrol ("USBP"). He directed the persons in the cabin to exit one by one, conducted pat-down searches of each person, removed them from the vessel, and provided them with water. Officer Andollo testified that he asked no further questions of anyone on the scene.

USBP took custody of the individuals discovered on the boat, later identified as ten Chinese nationals and one Guyanese national. Defendant and the two vessel operators were taken into custody by ICE. Defendant, Mr. Lopez and Mr. Miranda were read their *Miranda* rights in Spanish, signed a waiver of their rights written in Spanish, and each later made voluntary statements to ICE. Once all persons and the boat were secured, Officer Andollo completed his inspection of the vessel and subsequently issued citations to Mr. Lopez for failing to have a life jacket for each individual

4

CASE NO. 08-20266-CR-ALTONAGA

aboard and failing to have a fishing license. Mr. Miranda was also cited for failing to have a fishing license.

## II.  ANALYSIS

The Fourth Amendment of the United States Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The exclusionary rule provides that evidence obtained or derived from a search that violates the Fourth Amendment cannot be used against the victim of the illegal search and seizure in a criminal trial. *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (citing *United States v. Terzado-Madruga*, 897 F.2d 1099, 1112 (11th Cir. 1990)). The admissability of evidence obtained from a state law enforcement officer's search and introduced in a federal criminal proceeding is governed by federal law. *United States v. Clay*, 355 F.3d 1281, 1283 (11th Cir. 2004).

Whenever a law enforcement officer restrains an individual's "freedom to walk away," *Terry v. Ohio*, 392 U.S. 1, 16 (1968), a seizure occurs, invoking some level of Fourth Amendment protection depending upon the nature of the stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). The Supreme Court has identified three types of stops: (1) brief, consensual and non-coercive interactions requiring no scrutiny; (2) investigative stops requiring limited scrutiny; and (3) full searches, custodial detentions or arrests that demand even stricter scrutiny. *See Perkins*, 348 F.3d at 969 (citations omitted). When a law enforcement officer engages in an investigative stop, the officer must have reasonable suspicion based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion, even if the officer lacks probable cause. *Terry*, 392 U.S. at 21, 30.

5

CASE NO. 08-20266-CR-ALTONAGA

In evaluating the stop, courts employ a totality-of-the-circumstances approach in assessing whether the officer's actions were "'reasonably related in scope to the circumstances which justified the interference in the first place,'" *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (quoting *Terry*, 392 U.S. at 20), and whether the duration of the stop was limited to the time necessary to effectuate its purpose. *Id.* (citing *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999)). Furthermore, the officer may engage in a protective sweep of the immediate area to dispel a reasonable fear for his own or others' safety by conducting a carefully limited search. *See Terry,* 392 U.S. at 30; *Brignoni-Ponce*, 422 U.S. at 873.

Courts and legislatures have long recognized a distinction between searches of dwellings or structures, and searches of automobiles, boats and other moveable vehicles. *See Carroll v. United States*, 267 U.S. 132, 150 (1925) (citing *Hester v. United States*, 265 U.S. 57 (1924)). In establishing an exigency exception to the warrant requirement of the Fourth Amendment, the United States Supreme Court recognizes that in conducting "a search of a ship, motor boat, wagon or automobile . . . [it] is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll,* 267 U.S. at 153. Maritime law and the broad authority granted to Customs and Coast Guard officers have led courts to rule that "privacy interests at sea may be more restrictive than those applicable on land." *United States v. Lopez*, 761 F.2d 632, 635 (11th Cir. 1985) (citing *United States v. Herrera*, 711 F.2d 1546, 1553 (11th Cir. 1983)).

Florida law grants all certified law enforcement officers the power to enforce rules of the Fish and Wildlife Commission. Fla. Stat. § 370.028 (2007). That authority includes searching and inspecting vessels without a warrant when officers "have reason to believe that fish or any saltwater

6

products are taken . . . in violation of laws or rules . . . ." Fla. Stat. § 370.01(6) (2007). The "reason to believe" standard has been interpreted by the Florida courts to mean probable cause. *Tingley v. Brown*, 380 So. 2d 1289, 1291(Fla. 1980). Additionally, an officer "who has probable cause to believe that the vessel has been used for fishing prior to the inspection shall have full authority to open and inspect all containers where saltwater products are normally kept aboard vessels . . . but specifically excluding such containers that are located in sleeping or living areas of the vessel." Fla. Stat. § 370.021(8)(b) (2007).

Defendant seeks to suppress the evidence resulting from the search conducted by Officer Andollo of Defendant's vessel and the subsequent voluntary statements made by Messers. Lopez and Miranda. Defendant claims Officer Andollo did not have reasonable suspicion to stop the vessel or probable cause to search the vessel, and even if he did, he exceeded the scope of the fisheries inspection permitted by Florida Statute Section 370.021(8)(b), by opening the hatch to the cuddy cabin where the eleven foreign nationals were found.

The evidence establishes that Officer Andollo had reasonable suspicion under federal law to conduct an investigatory stop based on his observation of the vessel occupants' behavior while returning to port and at the boat ramp, the nature and arrangement of their fishing equipment, and the fact that it was the opening day of lobster season. The failure of Messrs. Lopez and Miranda to produce saltwater fishing licenses after disembarking from a boat displaying fishing gear, their conflicting fishing reports, the nervous behavior of all three men at the ramp, and their haste in securing and loading the boat on the trailer provided Officer Andollo with probable cause to believe that the vessel had been used for fishing and gave him the authority, under both federal and Florida law, to board the vessel to conduct a fisheries inspection. While Florida law establishes spatial limits

CASE NO. 08-20266-CR-ALTONAGA

to fisheries inspections, Officer Andollo acted within the scope of federal law in engaging in a limited protective sweep that included opening the cuddy cabin hatch to insure that no one else was aboard the vessel. The nervous behavior of the three men and their haste in securing the boat prompted Officer Andollo's protective sweep and it was that limited protective sweep that revealed the eleven foreign nationals.

Officer Andollo acted on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop and the limited search of Defendant's vessel. *Terry,* 392 U.S. at 21, 30. Accordingly, the search and seizure did not run afoul of the Fourth Amendment.

### III.  CONCLUSION

Consistent with the foregoing, it is **ORDERED AND ADJUDGED** that the Motion to Suppress **[D.E. 27]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 14th day of July, 2008.

*[signature]*
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record