UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-20266-CR-ALTONAGA

UNITED STATES OF AMERICA,

    Plaintiff,

- versus -

ABIMEL CARABALLO,

    Defendant.

_____/

**GOVERNMENT'S SUPPLEMENTAL
MOTION FOR RECONSIDERATION**

On July 23, 2008, the government moved the Court to reconsider its decision dismissing the 8 U.S.C. § 1324(a)(2)(B)(iii) counts (counts 13 through 23) of the indictment against Abimel Caraballo, the defendant. (DE 52.) On July 28, the Court granted the government's request to supplement its reconsideration motion with a more extended discussion of the regulatory framework governing boat owners, like Caraballo, who bring in passengers to the United States.[1] (DE 57.)

For the reasons that follow, an understanding of the purpose and operation of

---

[1] This supplement does not displace the government's motion for reconsideration. As the government discussed at the July 28 calendar call, the supplemental motion provides additional information about the comprehensive regulatory scheme governing the duties of boat owners that was not part of the reconsideration motion.

§ 1324(a)(2)(B)(iii) in the context of the immigration enforcement procedure considered as a whole should warrant the Court's reconsideration of its prior order and, in any event, it is respectfully submitted that the present state of the record, in light of the full statutory framework, does not provide a sufficient factual basis for dismissal of the § 1324(a)(2)(B)(iii) counts.

**I.      The Role of the "Bring and Present" Requirement in the Immigration Regulatory Scheme.**

The Court's order dismissing the § 1324(a)(2)(B)(iii) charges against Caraballo is predicated on the assumption that § 1324(a)(2)(B)(iii) creates the obligation of transporters to "bring and present" undocumented aliens to an immigration officer at a designated port of entry.  Based upon that premise, the Court held that the requirement violated the Fifth Amendment because it seemingly requires transporters to produce and identify to government agents persons whom the transporter knows or reasonably suspects lack authorization for admittance.  Under those circumstances, the Court concluded that the act of presenting such persons necessarily inculpates the transporter for knowingly bringing illegal aliens to the United States in violation of the other counts in the indictment.

Respectfully, the Court's reading of the statute is erroneous because it views § 1324(a)(2)(B)(iii) in isolation from the broader regulatory scheme of which it is, in fact, only a penal provision.  Viewed in conjunction with the full statutory scheme, §

1324(a)(2)(B)(iii) cannot be seen as the source of the "bring and present" requirement; rather, that directive is established by multiple statutory and regulatory provisions wholly independent of § 1324(a)(2)(B)(iii) and imposed on all persons seeking entry to the United States. Seen in full context, § 1324(a)(2)(B)(iii) is merely a penalty provision for those who fail to follow the proscribed procedure; it is plainly not the source of the requirement that persons seeking admittance to the United States be presented to an immigration officer at a proper port of entry.

In this respect, the "bring and present" requirement is no different than any number of other reporting requirements, arising in highly-regulated areas and enforced by threat of criminal sanctions. For example, parties to monetary transactions involving more than $10,000 must report those incidents to the Treasury Department. See 31 U.S.C. § 5313(a). The failure to report is made criminal, and the punishment for nonfeasance may be enhanced if committed "while violating another law of the United States." Id. § 522(b). Although the penalty provision is directed at a criminal subset of persons charged with knowingly failing to obey the regulatory filing requirement, it has been repeatedly held not to run afoul of the Fifth Amendment because the reporting obligation is universal. See, e.g., United States v. Mickens, 926 F.2d 1312, 1331 (2d Cir. 1991). While the rationale of the Court's order would invalidate the currency-transaction-reporting statute as well as other compelled

disclosure requirements, the circuit courts have consistently upheld them against Fifth Amendment attacks. See United States v. DesJardins, 747 F.2d 499, 508 (9th Cir. 1984) (rejecting Fifth Amendment challenge to reporting requirements for international transportation of currency); United States v. Dichne, 612 F.2d 632, 639–40 (2d Cir. 1979) (same); United States v. Rios-Gonzalez, 450 F.2d 1213, 1216–17 (2d Cir. 1971) (rejecting Fifth Amendment challenge to mandatory customs declarations pursuant to 18 U.S.C. § 545).

Accordingly, application of § 1324(a)(2)(B)(iii) to persons who have flouted the "bring and present" requirement is merely the enforcement of universally applicable disclosure requirements that do not violate the right against compelled self-incrimination.

**(a)     The "bring and present" requirement within the regulatory scheme.**

All persons being shepherded into the United States from abroad must, under multiple statutory commands, be brought before an immigration officer at a designated port of entry. That duty has long existed separate and apart from § 1324(a)(2)(B)(iii), which merely provides a framework for punishing those who have violated the prescribed procedure.

The immigration code made it the transporter's duty to bring all passengers entering the United States to a designated port decades before § 1324(a)(2)(B)(iii) was

in force. In 1952, the Immigration and Nationality Act was enacted, and its § 271(a) provided:

> It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines, or international bridges or toll roads . . . bringing an alien to, or providing a means for an alien to come to, the United States . . . to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers.

Immigration and Nationality Act of 1952, Pub. L. No. 414, § 271(a), 66 Stat. 163, 226 (1952). Section 271 remains intact in the current immigration code as 8 U.S.C. § 1321(a).[2] Thus, from 1952 on, it has been the duty of every person—including owners of vessels—transporting aliens to the United States to make sure those entering are brought to a designated port and not landed elsewhere. This duty has not changed with the enactment of § 1324(a)(2)(B)(iii).

The 1952 Act also included § 231, which provided:

> Upon the arrival of any person by water or by air at any port within the United States from any place outside the United States, it shall be the duty of the master or commanding officer, or authorized agent, owner, or consignee of the vessel or aircraft, having any such person on board

---

[2] Section 1321(a) of Title 8 currently reads: "It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines, or international bridges or toll roads . . . bringing an alien to, or providing a means for an alien to come to, the United States . . . to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers." 8 U.S.C. § 1321(a).

>to deliver to the immigration officers at the port of arrival typewritten or printed lists or manifests of the persons on board such vessel or aircraft.

Immigration and Nationality Act of 1952, Pub. L. No. 414, § 231(a), 66 Stat. 163, 196 (1952). The requisite manifest included the passenger's complete name, date of birth, citizenship, sex, passport number and country of issuance, country of residence, United States visa number, date, and place of issuance, alien registration number, and United States address. 8 U.S.C. § 1221(c).

Section 231 remains substantially intact and is codified as 8 U.S.C. § 1221.[3] Thus, from 1952 on, boat owners of commercial vessels had the duty to keep a manifest on each of their passengers, deliver the manifest at the designated port, and provide to immigration officials extensive information about each of their passengers.

Finally, in 1967, the then-Immigration and Naturalization Service promulgated regulations requiring that "[a]ll persons seeking to enter the United States shall make application in person to an immigration officer at a U.S. port of entry." Inspection of Persons Applying for Admission, 32 Fed. Reg. 9627 (July 4, 1967). That regulation

---

[3] Section 1221 of Title 8 currently reads: "For each commercial vessel or aircraft transporting any person to any seaport or airport of the United States from any place outside the United States, it shall be the duty of an appropriate official . . . to provide to any United States border officer . . . at that port manifest information about each passenger, crew member, and other occupant transported on such vessel or aircraft prior to arrival at that port." 8 U.S.C. § 1221(a). An "appropriate official" includes the boat owner. Id. § 1221(d). And a commercial vessel is defined as "any civilian vessel being used to transport persons or property for hire." 8 C.F.R. § 286.1(d).

has not materially changed. See 8 C.F.R. § 235.1(a).[4] Thus, from 1967 on, all passengers on a boat entering the United States were under administrative compulsion to be brought to immigration officials at designated ports.

This was the law when Congress added § 1324(a)(2)(B)(iii) as part of the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 112, 100 Stat. 3359, 3382 (1986). Section 1324(a)(2) was a response to the 1980 Mariel boatlift, and was enacted to address the "gap" in then-current law that failed to criminalize the landing in the United States of aliens known to the transporter to be unauthorized to enter. See H.R. Rep. No. 99-682, pt. I, at 65–66 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5669–70 ("The Committee is convinced that this gap in current law must be closed. Without the threat of criminal prosecution, there is no effective way to deter potential transporters from inundating U.S. ports of entry with undocumented aliens. As happened during the Mariel episode, the United States would be forced to expend extraordinary amounts of money and human resources in processing, monitoring, caring for and giving hearings to exorbitant numbers of people.").

The 1986 Act "clarifie[d] that a person who knowingly [sic] transports an

---

[4] Immigration regulation § 235.1(a) currently reads: "Application to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry . . . ." 8 C.F.R. § 235.1(a).

7

undocumented alien to any place in the United States will be subject to criminal prosecution if that person knew the alien was undocumented or acted with wilful blindness concerning the alien's immigration status." Id. at 66. "Absent aggravating circumstances," knowingly smuggling an illegal alien to the United States carried a maximum penalty of "up to one year in jail"—a misdemeanor. Id. However, "the bill increase[d] the penalties for . . . knowingly bringing aliens, whether documented or not and whether an entry occurs or not, to any place in the United States other than designated ports of entry." Id. Section 1324(a)(2)(B)(iii) is one of these aggravating factors.

In other words, § 1324(a)(2)(B)(iii) did not impose a new duty on boat owners to bring their passengers to a designated port; the smuggling of aliens into the United States has always been a felony, and indeed, liability under § 1324(a)(2)(B)(iii)'s predecessors did not require violation of the "bring and present" procedure. In expanding the reach of the statute in 1986 to bring within its purview additional conduct not previously deemed criminal, Congress plainly did not intend to contract the reach of the longstanding alien smuggling felony or to make its prosecution more difficult than it historically had been.

The "bring and present" obligation existed at least as early as 1952; § 1324(a)(2)'s role was simply to provide the criminal sanction for those knowingly

8

smuggling unauthorized aliens into the United States, and to provide for sentencing enhancements for certain aggravations of that duty, including the smuggling of aliens by landing them at a place other than a designated port of entry.

**(b)     The Fifth Amendment and the Regulatory Scheme.**

The Self-Incrimination Clause of the Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V.[5]  "The Supreme Court has made it clear that the privilege

---

[5] As the Court noted in its order dismissing the § 1324(a)(2)(B)(iii) counts, Caraballo's privilege against self incrimination "not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." Hoffman v. United States, 341 U.S. 479, 486 (1951). (DE 50 at 2.)  Thus, if § 1324(a)(2)(B)(iii) is unconstitutional as applied to the indictment against Caraballo, it is unconstitutional if the statute requires him to "furnish a link in the chain of evidence needed to prosecute [him] for a federal crime." The constitutional analysis is unaffected by the government's decision not to prosecute the defendant for the federal crime in which he furnished a link in the chain of evidence.

Nor does it affect the analysis if the defendant is ultimately convicted of the federal crime for which he furnished a link in the chain of evidence. Cf. Minnesota v. Murphy, 465 U.S. 420, 426 (1984) ("The Fifth Amendment, in relevant part, provides that no person 'shall be compelled in any criminal case to be a witness against himself.'  It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' . . .  A defendant does not lose this protection by reason of his conviction of a crime . . . ." (citation omitted)).  The statute that required the defendant to incriminate himself would still be unconstitutional as applied to him
(continued...)

against compelled self-incrimination applies only to situations in which an individual 'is compelled to make a Testimonial communication that is incriminating.'" United States v. Authement, 607 F.2d 1129, 1131 (5th Cir. 1979) (quoting Fisher v. United States, 425 U.S. 391, 408, 96 S. Ct. 1569, 1579 (1976)).

> Three elements must exist simultaneously before the fifth amendment is violated. There must be (1) compulsion of a (2) testimonial communication that is (3) incriminating. If any one of these conditions is not satisfied, compelled self-incrimination within the meaning of the fifth amendment is not at stake.

Id. (citation and footnote omitted). Because § 1324(a)(2)(B)(iii) does no more than decree the punishment for violation of a duty imposed elsewhere in the regulatory regime, none of the Fifth Amendment's three required elements are implicated by the challenged provision.

### 1. Compulsion.

Section 1324(a)(2)(B)(iii) does not create the duty on behalf of a boat owner, like Caraballo, to bring and present his illegal alien passengers to an immigration officer at a designated port. The duty of a boat owner to bring all passengers to a

---

[5](...continued)
irrespective of the defendant's conviction of the federal crime for which he furnished a link in the chain of evidence or the government's decision not to charge the defendant with the federal crime. Thus, if Caraballo's case proceeded with just the non-§ 1324(a)(2)(B)(iii) counts, and he was convicted of those counts, it would not moot Caraballo's claim that § 1324(a)(2)(B)(iii) is unconstitutional as applied to him because the statute, under Caraballo's view, still forced him to self-incriminate by bringing and presenting his passengers to a designated port.

designated port exists elsewhere: as noted above, § 1321(a) makes it the duty of boat owners to prevent the landing of his passengers anywhere other than a designated port; § 1221(a) makes it a commercial boat owner's duty to maintain a manifest of his passengers and to give that manifest to immigration officials when the ship arrives in the United States; and finally, regulation § 235.1(a) makes it the obligation of all those entering the United States to enter through the designated port after submitting to an examination.

Thus, the obligation to bring and present to immigration officials entrants to the United States exists wholly independently of § 1324(a)(2)(B)(iii). While that section recites the relevant "bring and present" language, it does not create the obligation. If § 1324(a)(2)(B)(iii) had never been enacted, boat owners would still be required to bring and present their passengers to immigration officials at a designated port and give them all the information in the manifest. Section 1324(a)(2)(B)(iii) does not force the boat owner of a commercial vessel to do anything that he is not already required to do under §§ 1321(a), 1221(a), and 8 C.F.R. § 235.1.

Section § 1324(a)(2)(B)(iii)'s function is merely to provide a penalty for those boat owners who do not comply with their duty to bring their passengers to the designated port. Section 1324(a)(2)(B)(iii) doesn't create that duty; it merely penalizes the failure to comply with it.

## 2.      **Testimonial Communication.**

While the Fifth Amendment pertains only to "testimonial communications," a coerced action may, like a coerced statement, fall within its protection. The compelled production of records "may be deemed testimonial because the presentation of the records conveys information highly relevant to the documents themselves." (DE 52 at 7.) In such circumstances, the act of production signifies their authenticity and the party's possession and control over them, and may thus be seen as self-incriminating. (Id.)

In this case, because the comprehensive regulatory scheme requires all boat owners to bring every passenger to a designated port, there is nothing incriminating or even relevant communicated by the act. Because all boat owners are under the same duty to present all their passengers to immigration officials, Caraballo is in the same posture as Carnival Cruise Lines and the thousands of other boat owners that arrive in South Florida from outside the United States carrying passengers. Nothing about the act of bringing those passengers to the designated port signifies the transporters' awareness of their lack of authorization to enter, and thus the "bring and present" requirement does not in and of itself constitute any form of testimonial communication.

Those thousands of boat owners are simply complying with the comprehensive

regulatory scheme that requires that they bring all passengers to the designated port. Caraballo, like his fellow boat owners, communicates nothing by complying with his regulatory duty.

### 3.     Incrimination.

In Albertson v. Subversive Activities Control Bd., 382 U.S. 70 (1965), the Supreme Court explained that the requirement of the defendant that he register as a member of the Communist Party was incriminating because it was "directed at a highly selective group inherently suspect of criminal activities." Id. at 79; see also California v. Byers, 402 U.S. 424, 430 (1971) (plurality opinion).  The problem with targeting a regulation to a highly selective group inherently suspect of criminal activity, the Court said, is that complying with it necessarily incriminates those in the group.  In this case, unlike in Albertson, there is no incrimination problem because the regulatory obligation on boat owners to bring their passengers entering the United States to a designated port is "neutral on [its] face" and "directed at the public at large."  See Albertson, 382 U.S. at 79.  All passengers must be so presented, whether or not the transporter knows or suspects that they are without authorization to enter. Thus, there is nothing incriminating communicated by the boat owner's compliance with the regulatory duty.

The comprehensive immigration scheme discussed above applies to all boat

owners. Under § 1321(a), all boat owners entering the United States have the duty to make sure that their passengers are brought to a designated port. Under § 1221(a) commercial boat owners must keep a manifest with extensive information on all of their passengers, and deliver the manifest to immigration officials when the boat enters the United States. And, 8 C.F.R. § 235.1(a) requires that all persons entering the United States be brought to a designated port to be examined by immigration officials.

The duties conferred on boat owners by the comprehensive immigration scheme are not limited to those who know or suspect they have transported illegal aliens, but rather apply to all boat owners who bring anyone to the United States. Section 1321(a), for example, applies to "every person, including the owners . . ., bringing an alien to, or providing a means for an alien to come to, the United States." 8 U.S.C. § 1321(a). Section 1221(a) applies to "each commercial vessel . . . transporting any person to any seaport or airport of the United States from any place outside the United States." Id. § 1221(a). And, regulation § 235.1(a) contains no limit on the duty of boat owners to apply to lawfully enter the United States "in person to an immigration officer at a U.S. port-of-entry." 8 C.F.R. § 2351.(a).

Where one's duty to act "is directed at all persons," "[i]t is difficult to consider this group as either 'highly selective' or 'inherently suspect of criminal activity.'"

Byars, 402 U.S. at 430–31.  In this case, Caraballo's duty to bring his passengers to a designated port was a common duty directed at all boat owners entering the United States.  There is nothing selective about the duty to bring passengers entering the United States, nor is it targeted to inherently suspect criminal activity.  Indeed, every day in South Florida boats come in and out of port with passengers entering the United States without implying anything incriminating.

There is nothing inherently criminal about boat owners bringing their passengers entering the United States to a designated port to be examined by immigration officials.  Caraballo's status as a commercial boat owner bringing in passengers to the United States is no different than Carnival Cruise Lines status when it brings thousands of passengers into the United States everyday; neither are presumed to be acting improperly by virtue of their adherence to the command to bring and present their passengers to immigration officials at designated ports of entry. Just as there is nothing incriminating about Carnival living up to its regulatory obligation, so too would there have been no imputation of wrongdoing had Caraballo obeyed the regulatory scheme.

## II.    The Court Has Not Had the Benefit of A Developed Factual Record.

The Court's order dismissing the § 1324(a)(2)(B)(iii) counts, though it construed the motion to dismiss as an "as applied" constitutional challenge, was based

solely on the averments in the indictment.  (DE 50 at 1, 4–5.)  Caraballo, who mistakenly brought the matter as a "facial" challenge to the provision, did not seek a hearing, and accordingly, none was conducted.  The result of this was that the Court did not have the benefit of a developed factual record that would have, among other things, revealed the presence and relevance of the regulatory, non-criminal duty on Caraballo to "bring and present" his passengers to a designated port.

For example, as noted above, the immigration regulatory scheme imposes certain extensive passenger-identification requirements on commercial transporters, in addition to the mere directive to physically present them to an immigration officer at a port of entry.  See 8 U.S.C. § 1221(a).  Since the Court's ruling was issued in advance of trial, and in the absence of a request by Caraballo for an appropriate hearing, the Court was necessarily without the government's evidence tending to show that Caraballo was compensated for his efforts and that he was, therefore, a commercial transporter.  Consequently, the Court could not have been aware of this additional, independent non-criminal basis of Caraballo's duty to bring and present his alien passengers to a designated port.

Further, since the matter was not set forth in the indictment or otherwise stipulated, the government intends to prove at trial that Caraballo was the owner of the vessel and consequently had a duty pursuant to 8 U.S.C. § 1321(a) to bring and

present his passengers to a designated port (even though he did not perform the actual transportation).

The Court aptly recognized that the motion could only be entertained as an "as applied" challenge. However, since the parties have not developed a full factual record, the Court and the government have been placed at a disadvantage in resolving the matter since significant circumstances, including those relating to the various bases of Caraballo's "bring and present" obligations, have not been sufficiently brought to the Court's attention. See United States v. Reed, 114 F.3d 1067, 1070 (10th Cir. 1997) (reversing district court for reviewing the constitutionality of the § 922(g) charges against the defendant on "as applied" grounds based solely on the evidentiary proffer of the parties; "such a sensitive and fact intensive analysis as that undertaken by the district court should be based only on the facts as they emerge at trial").

Consequently, for the above reasons, the United States urges the Court, in the alternative, to withdraw its previously issued order and withhold resolution of the matter pending completion of the trial.[6]

---

[6] The Court suggested at its July 28, 2008 calendar call that its order was, in substance, merely a severance whereby counts one through twelve (the non-§ 1324(a)(2)(B)(iii) counts) of the indictment would be tried separately and in advance of counts thirteen through twenty-three (the § 1324(a)(2)(B)(iii) counts). This approach, the Court hypothesized, would avoid the constitutional issue because prior
(continued...)

## **Conclusion**

In sum, Caraballo had the duty to bring his passengers to a designated port independent of § 1324(a)(2)(B)(iii). If § 1324(a)(2)(B)(iii) was never enacted in 1986 as a response to Mariel, Caraballo would still have had to bring his passengers to a designated port as part of the comprehensive regulatory scheme governing entrance into the United States. When § 1324(a)(2)(B)(iii) was added to the books, it did not violate the boat owner's Fifth Amendment privilege against self-incrimination—the compulsion on boat owners to bring their passengers to a designated port was preexisting, it was not testimonial, and it did not incriminate boat owners by forcing

---

⁶(...continued)
adjudication of the non-§ 1324(a)(2)(B)(iii) charges would vitiate the Fifth Amendment objection to the "bring and present" requirement that, as the Court observed, had the capacity to inculpate the transporter in the inducement offenses set forth in the other counts of the indictment. Since severance of the challenged counts would result in adjudication of the other charges in and of themselves, the Court proposed that a severed trial of the non-§ 1324(a)(2)(B)(iii) counts would cure the Fifth Amendment objection.

For the reasons set forth above, the government would welcome the withdrawal of the Court's order dismissing the § 1324(a)(2)(B)(iii) charges pending trial of the full indictment. However, we remain of the view that no purpose would be served by a severance of the offenses because trial on counts one through twelve alone would not ameliorate the Fifth Amendment concerns expressed in the Court's order. As noted in footnote 5, the "bring and present" procedure must be judged at the time it is applied, and not by its subsequent consequences, even if its detrimental effect can be minimized.

them to furnish a link in the chain of evidence against them.  Because everyone was already required to comply with the regulatory duty to bring passengers entering the United States to a designated port, § 1324(a)(2)(B)(iii) added nothing other than criminal penalties for failing to comply with the duty.

Accordingly, the government requests that the Court reconsider its decision dismissing the § 1324(a)(2)(B)(iii) counts in the indictment against Caraballo, and vacate the order.  In the alternative, the government requests that the Court reserve its ruling on Caraballo's motion to dismiss and allow the trial to proceed on all the counts in the indictment.

        Respectfully submitted,

        R. Alexander Acosta
        United States Attorney

BY:   s/Russ Brown
       Special Assistant United States Attorney
       Court ID No. A5501216

       s/Stephen Schlessinger
       Assistant United States Attorney

       s/Robert J. Luck
       Assistant United States Attorney
       Florida Bar No. 0028065

## Certificate of Service

I HEREBY CERTIFY that on August 8, 2008, I electronically filed the government's supplemental motion for reconsideration with the Clerk of the Court using CM/ECF.

                                          s/Russ Brown
                                          Special Assistant United States Attorney